**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL EVAN KEELING,** | : | **Civil No. 4:09-CV-0147** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **PETE DAMITER, et al.,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

## I.     Introduction

This civil rights action brought by Michael Keeling, a state inmate, who is proceeding *pro se,* poses the following question: Can disparate acts, involving different actors, which are separated by a divide of years form the basis for a claim of unlawful retaliation? Because we find that the topical and temporal distance between the disparate events alleged in this case is far too great to sustain a viable constitutional retaliation claim, we recommend that the Defendants' summary judgment motion be granted, and Keeling's complaint be dismissed.

## II.    Statement of Facts and of The Case

### A.    The Background of Michael Evan Keeling

The undisputed facts in this case can be simply stated. The Plaintiff, Michael Evan Keeling, is a state prisoner who was convicted in 1998 and was sentenced to serve a cumulative 92 ½ to 185 years in the Pennsylvania prison system. In addition to these Pennsylvania sentences, Keeling also has an out-of-state detainers from New York state, including a detainer for a homicide charge. (Doc. 95, Ex. 1, p. 103 l. 14-20, Ex. 14 Kerestes Declaration, ¶ 5.) While in the Pennsylvania prison system Keeling has engaged in serious acts of misconduct, including an attempted escape from state custody. Thus, in October of 2000, after an attempted escape at SCI-Dallas, Keeling was one of several inmates transferred from SCI-Dallas due to his lengthy sentence and violent offense history. Keeling was transferred to SCI-Frackville, which is a more secure institution than SCI-Dallas. (Doc. 95, Ex. 12 Shannon Declaration, ¶ 2.; Exhibit 14 Kerestes Declaration, ¶ 4.)

### B.    Keeling's Litigation History

Keeling has also been a prodigious, if consistently unsuccessful, litigant in federal court while he has been housed in the state prison system. Thus, on March 8, 2000, Keeling filed a lawsuit, Keeling v. Keller, No. 4:00-CV-448, in the United States District Court for the Middle District of Pennsylvania. This *pro se* civil

complaint named a dozen Correctional Defendants, only one of whom, Chris Putnam, is a Defendant in the current action filed by Keeling. Keeling v. Keller, No. 4:00-CV-448 was dismissed by the district court on January 8, 2001, Keeling v. Keller, No. 4:00-CV-448, Doc. 41, and the dismissal of this case was affirmed by the court of appeals on April 21, 2003. Keeling v. Keller, No. 4:00-CV-448, Doc. 50.

On March 11, 2002, Keeling filed a second lawsuit in the United States District Court for the Middle District of Pennsylvania, Keeling v. Kintzel, No. 4:02-CV-408. This *pro se* civil complaint named a dozen Correctional Defendants, only one of whom, Defendant Kerestes, is a Defendant in the current action filed by Keeling. Keeling v. Kintzel, No. 4:02-CV-408 was dismissed by the district court in orders entered on August 3, 2003, and November 17, 2003, Keeling v. Kintzel, No. 4:02-CV-408 Docs. 75 and 94, and the dismissal of this case was affirmed by the court of appeals on August 5, 2004. Keeling v. Kintzel, No. 4:02-CV-408, Doc. 106.

The events which lie at the heart of this lawsuit involve events which occurred years after Keeling brought these unsuccessful civil lawsuits, and entail decisions made by persons who had no involvement in this prior civil litigation. Specifically, in his current complaint Keeling alleges that he was denied a prison transfer in 2007, and then lost his single-cell status two years later, in December, 2008, in retaliation for filing unsuccessful lawsuits against prison officials in 2000 and 2002.

With respect to these two prison transfer and cell assignment decisions the undisputed facts are as follows:

## C. Keeling's 2006 Attempted Transfer to SCI-Coal

In 2005, Keeling was housed at SCI-Frackville, a prison that provided higher security for inmate like Keeling, with documented escape histories. (Doc. 95 Ex. 12 Shannon Declaration, ¶ 2; Ex. 14 Kerestes Declaration, ¶ 4.) In 2005 and 2006 Keeling made a series of requests to transfer from SCI-Frackville to another prison. According to Keeling he sought these transfers " solely because I was in Frackville for about six and a half years with no misconducts." (Doc. 95, Ex. 1, Plaintiff's deposition p. 68, ll. 1-4.)

Keeling initially wished to return to SCI-Dallas, but his Unit Team was unable to secure a transfer for him to that prison. (Doc. 95, Ex. 12, Damore declaration, ¶ 9.) Keeling then requested to transfer to SCI-Coal in 2005, as an incentive-based transfer, but that transfer was also denied as Keeling was not eligible for such a transfer. (Doc. 95, Ex. 12, Damore Declaration, ¶ 10.) Defendant Kerestes, who was a Deputy Superintendent at SCI-Frackville in 2005, supported Keeling's request for this particular transfer in 2005 and voted in favor of Keeling's request to transfer to SCI-Coal. (Doc. 95, Ex. 14 Kerestes Declaration, ¶ 8.)

Despite these difficulties, officials at SCI-Frackville, however, continued to try to accommodate Keeling's transfer requests to a state prison closer to his home and family in New York. Thus, in May and June of 2006, Keeling's Unit Team at SCI-Frackville attempted to accommodate Keeling's requests to return to SCI-Dallas, but they were initially not able to transfer him back to SCI-Dallas. (Doc. 95, Ex. 12, Damore Declaration, ¶ 9.)

In October of 2006, at Keeling's request, Michael Damore, who was Keeling's Unit Manager, attempted once again to transfer Keeling. (Doc. 95, Ex. 12, Damore Declaration, ¶ 11.) While Keeling had never taken a single vocational class at SCI-Frackville, or any other institution in the Department of Corrections since his incarceration in 1995, Damore felt that the best way to grant Keeling's request to transfer was to process it as a vocational transfer, and, therefore, attempted to arrange Keeling's transfer to SCI-Coal as a vocational training transfer. (Id.) In an attempt to accommodate Keeling's request the superintendent at SCI-Frackville, Defendant Shannon, and his staff all supported this 2006 vocational transfer request for Keeling which was submitted in October, 2006. (Doc. 95, Ex. 12 Damore Declaration, ¶ 11; Ex. 13,Varano Declaration, ¶ 14; and Ex. 14, Kerestes Declaration ¶ 10.)

In the Department of Corrections system vocational transfers such as Keeling's required support from the sending institution, the Department of Corrections Central

Office, and the receiving institution. (Doc. 95, Ex. 12 Damore Declaration, ¶ 6.) Thus, the concurrence of the superintendent at SCI-Coal, Defendant Piazza, was also necessary before Keeling could obtain a vocational transfer to this facility. (Id.) In this case, Defendant Piazza objected to the proposed transfer. The reasons for these objections were detailed by Piazza and included a concern that in November, 2006, SCI-Coal was crowded and operating near maximum capacity. (Doc. 95, Ex. 15, Piazza Declaration, ¶ 3.) In addition, inmates such as Keeling, who were assigned to single cell status, were extremely difficult to house at SCI-Coal, which had a fixed number of cells with single-cell beds. (Id., ¶ 4.)

Furthermore, in reviewing Keeling's transfer request, Defendant Piazza questioned the vocational justification for the transfer because he noted that Keeling was serving a minimum 92 ½ years sentence, and thought that a vocational transfer was very unusual, given the length of his sentence. Defendant Piazza also observed that Keeling was already in his home region. (Id., ¶ 6.) Piazza further objected to Keeling's transfer to SCI-Coal because of Keeling's single cell Z-Code status, SCI-Coal's space limitations, and lack of a vocational justification for Keeling's transfer. ( Id., ¶ 7.) While the Defendants discussed these penological issues, they uniformly agree that Keeling's litigation history never came up as a topic in any

communications regarding Keeling's transfer. (Doc. 95, Ex. 12, Damore Declaration ¶ 17; Ex. 11, Shannon Declaration, ¶ 13; Ex. 15, Piazza Declaration, ¶ 10.)

Nonetheless, prison officials still tried to accommodate Keeling's request. Thus, Unit Manager Damore asked Keeling to relinquish his Z-Code status, a step which would have facilitated the transfer, but Keeling refused to voluntarily relinquish that status. (Doc. 95, Ex. 13,Damore Declaration, ¶ 15.) Indeed, Keeling concedes that Damore told him if he gave up his Z-Code he could likely get a transfer to SCI-Coal. (Doc. 95, Ex. 1, Plaintiff's Deposition, p. 100 l. 16-20.) Moreover, in correspondence to Keeling, Defendant Piazza suggested that Keeling try to adapt to double-celling, but Keeling once again refused. (Doc. 95, Ex. 2-H; Ex. 15, Piazza Declaration, ¶ 9.)

While Defendant Piazza opposed Keeling's transfer, he never discussed Keeling's litigation history with Defendant Kerestes, who was a deputy superintendent at SCI-Coal in 2006, and Piazza was unaware of Keeling's past litigation history at the time he objected to the transfer. (Doc. 95, Ex. 15, Piazza Declaration, ¶ 10-11.) Furthermore, while Defendant Kerestes advised Piazza that Keeling was a problematic inmate, Kerestes had no other input into Piazza's decision

to object to Keeling's transfer.[1] The decision was Piazza's alone. (Doc. 95, Ex. 15, Piazza Declaration, ¶ 1.)

After Piazza objected to the transfer, the Department of Corrections Central Office voided the transfer, on February 8, 2007. (Doc. 95, Ex. 12, Damore Declaration, ¶ 15.) Neither Defendant Shannon, as Superintendent at SCI-Frackville, nor Defendant Kerestes, as Deputy Superintendent at SCI-Coal, had authority to override Central Office's decision to void the transfer or force SCI-Coal to agree to

---

[1] In his opposition to this summary judgment motion, Keeling suggests that Defendant Kerestes' action advising Defendant Piazza that Keeling was a problematic inmate creates a factual issue on a retaliation claim. We disagree for three reasons. First, given the five-year gap between Keeling's litigation activity and these transfer discussions, these events are simply too remote as a matter of law to sustain a fair inference of retaliation. DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010)(denying inmate Z-code cell transfer retaliation claim, two months temporal proximity insufficient). Second, the undisputed evidence shows that Keeling's past litigation was never discussed by the Defendants in connection with this transfer decision. While Keeling plainly is skeptical of this uncontraverted proof, his skepticism, does not defeat summary judgment since "[o]ne cannot create an issue of fact merely by submitting an affidavit denying averments in conflicting affidavits without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982). Finally, given the fact that Keeling was a convicted killer, an escape risk, and an inmate with a history of mental health problems and special housing needs, the description of this prisoner as "problematic" seems apt.

house Keeling. (Doc. 95, Ex.11, Shannon Declaration, ¶ 12; Ex. 14. Kerestes Declaration, ¶ 3.)

###    D.    Keeling's 2007 Transfer to SCI-Dallas

On October 4, 2007, at Keeling's request, Unit Manager Damore submitted another transfer petition on his behalf, this time to SCI-Dallas. (Doc. 95, Ex. 12, Damore Declaration ¶ 18.) This request was approved and on November 13, 2007, only nine months after the transfer to SCI-Coal was voided, Keeling was transferred back to SCI-Dallas, the closest facility to his mother and extended family in New York City. (Id., ¶ 18.)

###    E.    Keeling's Loss of Z-Code Status, December 2008

When Keeling arrived at SCI-Dallas in 2007, he was housed in a "Z-Code" status, which meant that Keeling had a private cell. Z-Code housing is a form of single cell housing provided to inmates with active mental health problems who for health and safety reasons, in the judgment of prison health care professionals, would benefit from such housing. Z-Code housing assignments are governed by prison regulations, and are made at the discretion of prison officials. Specifically, Department of Corrections Policy 11.2.1 governs Single Cell Status "Z Codes" for inmates. (Doc. 95, Ex. 3, Miskell Declaration, ¶ 6-7; Exhibit 2-P40; Policy 11.2.1, Section 5.) While Policy 11.2.1 provides that inmates with mental health problems

should be considered for single cells, Policy 11.2.1 does not mandate or guarantee a single cell for any inmate, (id.) and not every inmate with a mental health history or problem receives a single cell. (Id.)

During his confinement in the state corrections system, Keeling had at various times sought this housing status, and had been denied Z-Code status on three occasions between 1998 and 2001. (Doc. 95, Ex. 4, Cicerchia Declaration, ¶ 8.) In making these requests, Keeling initially stated that the reason he needed a Z-Code was that he needed more privacy and space in his cell. (Doc. 95, Exs. 2-A; 2-B, 2-C, 2-D, 2-P2, 2-P3 and 2-P4.) Thus, Keeling's prior Z-Code requests had frequently been refused because of a lack of medical justification for this type of housing. (Id.) However, for a number of years while Keeling was actively receiving mental health treatment, he was also afforded Z-Code status at SCI-Frackville.

When Keeling initially arrived at SCI-Dallas in November, 2007, he continued to be afforded this form of housing. Keeling initially received this housing due to a past reported psychiatric history, although a psychiatric screening of Keeling when he arrived at SCI-Dallas indicated that Keeling was not using psychotropic medications; was not receiving treatment sessions of any type from psychiatry or psychology; and did not want to participate in psychiatric or psychological treatment services. (Doc. 95, Ex. 3, Miskell Declaration, ¶ 16.)

Keeling remained at SCI-Dallas on Z-code single cell status despite his lack of any on-going psychiatric treatment history until December,2008, when the Department of Corrections directed all institutions to review all single-cell (Z-Code) inmates to ensure that their Z-Codes were truly needed. This state-wide mandate was dictated by resource considerations: additional space was needed agency-wide due to an increase in inmate population. (Doc. 95, Ex. 4, Cicerchia Declaration, ¶¶ 11-13; Exhibit 6.) Thus, by December, 2008, SCI-Dallas was directed by Central Office to attempt to find space for 80 additional inmates. As a result all single celled inmates at SCI-Dallas, including Keeling, were to be reviewed. (Id.) In response to the review, a vote sheet was circulated on December 31, 2008, which led to the removal of Keeling's Z-Code status. At the time of the circulation of the vote sheet, Keeling was not under any psychiatric or psychological care or medication, and had not had any psychological treatment or medication since he was discharged from Psychiatry on February 8, 2007. (Doc. 95, Ex. 3, Miskell Declaration, ¶ 17; Exhibit 1, Keeling's deposition, p. 139 l. 17-25; Exhibit 2-P31 Votesheet of 12/31/08.) Accordingly, the decision to remove Keeling's Z-Code status was made for medical reasons, as part of a decision to allocate these limited housing resources to inmates with the greatest current need for those resources. Keeling was only one of many inmates who had their Z-Code removed pursuant to the December, 2008, review. (Doc. 95, Ex. 4,

Cicerchia Declaration, ¶ 14.) Indeed, Keeling conceded that he knew "a lot" other inmates who lost their Z-Code status during the December, 2008, review directed by the Central Office. (Doc. 95, Ex. 1, Keeling deposition, p. 152 ll. 19-25.)

Defendant Chris Putnam played no role in this process. While Putnam was Keeling's Unit Manager during his first stay at SCI-Dallas in 2000, (Doc. 95, Exhibit 7, Putnam Declaration, ¶¶ 4-5) and was still employed at the prison in 2008, Keeling had not been on Putnam's caseload since October of 2000. (Id.) Putnam was not Keeling's Unit Manager at the time his Z-Code was removed, was not aware of it, and had no discussions concerning Keeling's Z Code removal with any of the other Defendants. (Id., ¶¶ 6-7.)

Keeling responded to the removal of his Z-Code status defiantly, by initially refusing to accept a cell-mate. As a result of refusing an order to move into a double-cell, Keeling received a misconduct citation in February, 2009. (Doc. 95, Ex.t 2 -P30.; Exhibit 16, Misconduct hearing record.) Keeling pled guilty to this prison rules infraction, and was sentenced to 30 days in the Restricted Housing Unit as a result of refusing this order. (Doc. 95, Ex. 16, Misconduct hearing record.)

## F.  The Instant Lawsuit

Keeling filed the instant action in January of 2009, naming 22 prison officials as Defendants. (Doc. 1.) A number of these Defendants were dismissed from this

lawsuit at the inception of the litigation, (Docs. 36 and 40), leaving approximately ten Defendants in this action.

In his complaint, and a subsequent amended complaint, Keeling alleged that these ten prison officials engaged in two separate episodes of retaliation against him in terms of prison housing decisions and transfers, acts of retaliation that were allegedly based upon lawsuits that Keeling had filed against the Defendants many years prior to the prison transfers and placement decisions which are at issue in this case. Specifically, in paragraphs 1 through 41 of his Amended Complaint Keeling alleged that his 2006 attempt to transfer from SCI-Frackville to SCI-Coal was improperly thwarted by Defendants Piazza, Damore, Shannon, Kerestes, and Varano in retaliation for the filing of a prior lawsuit, <u>Keeling v. Kinzel</u>, 92-CV-0408. In paragraphs 42-120 of the Amended Complaint Keeling alleged that SCI-Dallas Defendants Keller, Cicerchia, Semon, Putnam, and Lopuhovsky conspired to improperly remove his Z-Code Status, which allowed him to occupy a single-cell, in retaliation for filing <u>Keeling v. Putnam</u>, a prior lawsuit filed in 2000 against Defendants Putnam and Keller when Keeling was first incarcerated at SCI-Dallas from 1999 to 2000.

The Defendants filed a motion for summary judgment on behalf of all Defendants. (Doc. 93.) In response to this motion, Keeling filed a brief (Doc. 126),

which contained a section entitled "Relinquish Liability" in which Keeling conceded that the following four Defendants should be dismissed from this case: Damore, Varano, Lopuhovsky, and Keller. (Doc. 126, pp.6-8.) We have, therefore, recommended dismissal of these Defendants from this lawsuit. (Doc. 132.)[2] Thus, at present this case proceeds forward against Defendants Shannon, Piazza, Kerestes, Semon, Putnam, and Cicerchia. As to these Defendants, the motion for summary judgment has been fully briefed, (Docs. 93-95, 125-130), and is ripe for resolution.

For the reasons set forth below, it is recommended that the motion for summary judgment be granted, and the complaint dismissed as to all remaining Defendants.

## II.    Discussion

### A.    Summary Judgment, Standard of Review

Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).   A district court may properly grant a motion for summary

---

[2]We note that Keeling has now objected to the dismissal of these Defendants, (Doc. 133) a dismissal which he actually proposed. (Doc. 126.) To the extent that the dismissal of these Defendants is now contested by Keeling, we would note that the rationale set forth in this report and recommendation would also fully support the dismissal of these Defendants from this lawsuit.

judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment

is appropriate. <u>Celotex</u>, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. <u>Anderson</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. <u>Id.</u> at 252; <u>see also</u>, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).Moreover, "[o]ne cannot create an issue of fact merely by submitting an affidavit denying averments in conflicting affidavits without producing any supporting evidence of the denials." <u>Thimons v. PNC Bank, NA</u>, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." <u>Fireman's Ins. Co. of Newark NJ v. DuFresne</u>, 676 F.2d 965, 968 (3d Cir. 1982)."[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." <u>Lockhart v. Hoenstine</u>, 411 F.2d 455, 458 (3d. Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985) (citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)). However, when making this summary judgment determination, the Court must "consider all

evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

In addition, to these general guiding principles defining the proper scope of summary judgment, several other legal tenets control the resolution of this matter.

**B.  Keeling Has No Constitutional Right to a Specific Cell Assignment**

At the outset, it is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification. Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976). Thus, inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." Id. Similarly, it has long been recognized that the mere fact of a prison transfer, standing alone, does not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. See, e.g., Hassain v. Johnson, 790 F.2d 1420 (9th Cir. 1986); Serrano v. Torres, 764 F.2d 47 (1st Cir. 1985). Thus, even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment. See, e.g., Gov't of Virgin Island v. Gereau, 592 F.2d 192 (3d Cir. 1979)(transfer from Virgin Islands to mainland); Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969)(transfer from

Puerto Rico to Atlanta). In short, well-settled law establishes that prisoners have no inherent constitutional right to placement in any particular prison, to any security classification, or to any particular housing assignment. See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215 225 (1976); Montanye, 427 U.S. at 242; Bulger v. U.S. Bureau of Prisons, 65 F.3d 48 (5th Cir. 1995); Marchesani v. McCune, 531 F.2d 459 (10th Cir.1976).

These principles apply with particular force to claims of state prisoners, like those made by Keeling, seeking entitlement to single-cell Z-code status. These claims have been consistently rebuffed by the courts, which hold that inmates have no constitutional right to this special housing status. See, e.g., DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010)(denying inmate Z-Code cell transfer retaliation claim); Emile v. SCI-Pittsburgh, No. 04-974, 2006 WL 2773261, *6 (W.D.Pa. Sept. 24, 2006) (denying inmate preliminary injunction in the form of Z-code cell status); Brown v. Sobina, No. 08-128E, 2008 WL 4500482 (W.D.Pa. Oct. 7, 2008)(denying inmate preliminary injunction); Messner v. Bunner, No. 07-112E, 2009 WL 1406986 (W.D.Pa. May 19, 2009)(denying inmate preliminary injunction in the form of Z-code cell status). Therefore, to the extent that Keeling attempts to premise his claims in this case on some constitutional right to a particular housing arrangement, those claims plainly fail to state a cause of action upon which relief can be granted.

## C.    Keeling Has Not Stated a Viable Inmate Retaliation Claim

Recognizing the fact that he is not entitled to a particular transfer or housing status, Keeling has cloaked his constitutional claims as a cause of action against prison officials based upon allegedly retaliatory transfers within the prison, transfers that occurred many years after Keeling filed two, unsuccessful federal lawsuits. Keeling's retaliation claim rests, in large measure, on circumstantial evidence, with Keeling asserting that the timing and chronology of these events are circumstantial proof of this retaliation. Indeed, Keeling must advance this claim circumstantially, since the direct evidence marshaled in this case rebuts any claim of retaliation.

Keeling faces a demanding burden of proof in attempting to allege such a retaliation claim based upon circumstantial proof. Inmates like Keeling frequently invite courts to infer retaliatory motives to cell assignments and other prison policies. Yet, these invitations, while frequently made, are rarely embraced by the courts. Compare DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010)(denying inmate cell transfer retaliation claim, two months temporal proximity insufficient); Alexander v. Fitch, No. 07-1732, 2010 WL 1257709 (W.D. Pa. March 26, 2010)(same); Carpenter v. Kloptoski, No. 08-2233, 2010 WL 891825 (M.D. Pa. March 10, 2010)(same); Solan v. Ranck, No. 06-49, 2007 WL 141918 (M.D.Pa. Jan. 18, 2007)(denying retaliation claim, in part); with Curtician v. Kessler, No. 07-286, 2009 WL 2448106

(W.D. Pa. Aug. 7, 2009)(factual issues preclude dismissal of inmate cell transfer retaliation claim).

Rather, a prisoner claiming that prison officials have retaliated against him for exercising his constitutional rights must first prove the following three elements: (1) the conduct in which he engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct. Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002). With respect to the obligation to demonstrate that he suffered an adverse action, a plaintiff must demonstrate that he suffered action that "was sufficient to deter a person of ordinary firmness from exercising his rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). Examples of adverse actions that have, in certain cases, been found to support a retaliation claim include filing false misconduct reports, Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another prison, Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001), and placing a prisoner in administrative custody, Allah, 229 F.3d at 225.

The third essential element to a retaliation claim is that there be a causal link between the exercise of a constitutional right and the adverse action taken against the prisoner. Rauser, 241 F.3d at 333-34. To establish this third, and crucial, component

to a constitutional retaliation claim, causation, Keeling must make an exacting

showing. In this setting:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. See Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir.1997). In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir.2000).

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Moreover, when examining these causation issues, we are specifically admonished

that:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement

that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

Id. at 267-68.

Mindful of these concerns, courts have in the past carefully scrutinized inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity between the plaintiff's conduct and allegedly retaliatory acts. Indeed, this Court has spoken directly to the issue of what must be shown to state a valid complaint in this factual context, noting that:

To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity motivated the defendant to perform the retaliatory act. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir.2002); Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D.Pa. Apr.13, 2006) (observing that a plaintiff must demonstrate that the exercise of First Amendment rights "played some substantial role" in the defendant's action). The temporal proximity of a retaliatory act to a plaintiff's exercise of his or her First Amendment rights is probative, but not dispositive, of the causation element. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir.2003); see also Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir.1997) (stating that "temporal proximity merely provides an evidentiary basis from which an inference can be drawn"). For temporal proximity alone to establish causation, the "timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." Marasco, 318 F.3d at 512 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997)) . . . [T]he Third Circuit Court of Appeals has suggested that a temporal proximity of two days is sufficient to establish causation, see Farrell v.

> Planters Lifesavers Co., 206 F.3d 271, 279 & n. 5 (3d Cir.2000), whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of . . . wrongdoing, Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir.2003). This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence.

Conklin v. Warrington Tp., No. 06-2245, 2009 WL 1227950, *3 (M.D.Pa. April 30,2009)

Applying this standard, courts in civil rights cases have frequently rebuffed speculative efforts to infer causation from temporal proximity when a span of weeks, months or years separated the plaintiff's constitutionally protected conduct from the defendants' alleged acts of retaliation. Thus, "[o]ur sister courts have held that a temporal proximity of as little as seventeen days was insufficient to establish causation. See Killen v. N.W. Human Servs., Inc., No. 06-4100, 2007 WL 2684541, at *8 (E.D.Pa. Sept.7, 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation); see also Farrell, 206 F.3d at 279 n. 6 (suggesting that temporal proximity of seven weeks would be insufficient to establish causation); Smith v. ABF Freight Sys., Inc., No. 04-2231, 2007 WL 3231969, at *11 (M.D.Pa. Oct.29, 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar v. City of McKeesport, No. 05-19, 2007 WL 2769718, at *4 (W.D.Pa. Sept.20, 2007) (holding that temporal proximity of three months was insufficient to establish causation)." Fischer v. Transue, 04-2756, 2008

WL 3981521, *10 (M.D.Pa. Aug. 22, 2008)(holding that temporal proximity of three weeks was insufficient to establish causation).

In practice, application of these legal tenets has often led to the rejection of retaliation claims as legally insufficient when those claims are like the retaliation assertion made here: An assertion of retaliation based solely on circumstantial proof of some temporal link between the plaintiff's conduct and the defendants' actions when the evidence shows that these events are separated by a significant temporal gulf. See, e.g., DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010)(denying inmate cell transfer retaliation claim, two months temporal proximity insufficient); Bailey v. Commercial National Insurance Co., 267 F. App'x, 167 (3d Cir. 2008)(employment discrimination-retaliation case, four months temporal proximity insufficient); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir.1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir.1992) (4-month period insufficient); Conklin v. Warrington Tp., No. 06-2245, 2009 WL 1227950 (M.D.Pa. April 30, 2009)(two months temporal proximity insufficient); Rogers v. Delaware, Dept. of Public Safety/DMV 541 F.Supp.2d 623, 627 (D.Del. 2008)(10 months insufficient);Brown v. Boeing, 468 F.Supp.2d 729 (E.D.Pa. 2007)(3-4 months insufficient); Lumban-Tobing v. Potter, No. 04-979, 2005 WL 2100691 (M.D. Pa.

Aug. 30, 2005)(9 months insufficient temporal proximity, but other proof creates factual issue precluding summary judgment).

Finally, if a plaintiff discharges his obligation to satisfy this three-part *prima facie* test, the burden then shifts to the defendant to prove by a preponderance of the evidence that he or she would have made the same decision absent the protected conduct for reasons reasonably related to penological interest. Carter, 292 F.3d at 158. "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334.

Moreover, a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred. Quite the contrary, to state a claim under §1983, the plaintiff must show that the supervisory defendants, acting under color of state law, deprived him of a right secured by the Constitution or laws of the United States. 42 U.S.C. §1983; Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also Maine v.Thiboutot, 448 U.S. 1 (1980). Liability under § 1983 is personal in nature and can only follow personal involvement in the alleged

wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice. <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286 (3d Cir. 1997).

In particular, with respect to prison supervisors it is well-established that:

> "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir.1988).

<u>Evancho v. Fisher</u>, 423 F.3d 347, 353 (3d Cir. 2005).

Applying these benchmarks, courts have frequently held that, in the absence of evidence of supervisory knowledge and approval of subordinates' actions, a plaintiff may not maintain an action against supervisors based upon the misdeeds of their subordinates. For example, in <u>O'Connell v. Sobina</u>, No. 06-238, 2008 WL 144199, *21 (W.D. Pa. Jan. 11, 2008), the court rejected an effort to hold supervisors liable for the acts of staff holding that:

> Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a subordinate's actions. <u>Rode</u>, 845 F.2d at 1207. "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." Id. <u>See also Evancho v. Fisher</u>, 423 F.3d 347, 353 (3d Cir. 2005). Moreover, in order to maintain a claim for supervisory liability, a plaintiff must show: 1) that the supervising official personally participated in the activity; 2) that the supervising official directed others to violate a person's rights; or 3) that

the supervising official had knowledge of and acquiesced in a subordinate's violations.  See Robinson v. City of Pittsburgh,120 F.3d 1286, 1293 (3d Cir. 1997); Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).

Similarly, in Neuburger v. Thompson, 305 F. Supp. 2d 521, 535 (W. D. Pa. 2004), the court rejected an effort to extend civil rights liability to supervisory officials without proof of personal involvement or acquiescence in wrongdoing, stating:

> Third Circuit case law recognizes that "(a) defendant in a civil rights action must have personal involvement in the alleged wrongs" in order to be liable. Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir.2003) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)). Consequently, a supervisor may be liable under 42 U.S.C. § 1983 for his or her subordinate's unlawful conduct if he or she directed, encouraged, tolerated, or acquiesced in that conduct. See Blanche Road Corp. v. Bensalem Twp., 57 F.3d 253, 263 (3d Cir.1995); Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir.1995).  However, the mere assertion "that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did" is insufficient to establish liability. Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989). Likewise, a supervisor's mere failure to train, supervise or discipline subordinate officers does not state a basis for a § 1983 claim against the supervisor absent proof of direct participation by the superior in some unlawful conduct.  Mobley v. City of Atlantic City Police Dept., No. Civ. A. 97-2086JBS, 2000 WL 363692 at *3 (D.N.J. March 30, 2000) (citing Brown v. Grabowski, 922 F.2d 1097, 1119-20 (3d Cir.1990)).

This case aptly illustrates the limitations which the law imposes upon those like Keeling who wish to tie disparate events, committed by different actors, together into a seamless web of retaliation.  Recognizing that we "must be diligent in enforcing these causation requirements" of a retaliation claim,  Lauren W. ex rel. Jean W. v.

DeFlaminis, 480 F.3d 259, 267-68 (3d Cir. 2007), the undisputed evidence in this case simply does not permit any inference of a causal relationship between the events described by Keeling. Indeed, that causal connection fails for a host of reasons.

First, the causal inference Keeling wishes to draw fails because his constitutionally protected litigation activity was remote in time and place from the prison transfer and cell assignments which lie at the heart of this lawsuit. Keeling filed his prior lawsuits in 2000 and 2002. Those lawsuits were dismissed in 2001 and 2003. The transfer and cell assignment decisions that are the focus of Keeling's current complaint occurred in 2007 and 2008, more than five years after Keeling's federal litigation had drawn to an unremarkable, and unsuccessful, conclusion. Since the United States Court of Appeals for the Third Circuit has held in the context of an inmate retaliation claim based upon the denial of Z-Code status that a temporal proximity of several months is inadequate to support an inference of causation, See DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010)(denying inmate Z-code cell transfer retaliation claim, two months temporal proximity insufficient), it follows that a five year gulf between these events is far too remote to support such a retaliation claim.

Furthermore, the undisputed facts wholly undermine this retaliation claim in a host of other ways. For example, Keeling alleges that Defendants Shannon, Piazza,

Semon, and Cicerchia, retaliated against him because of his prior litigation even though these Defendants were never named by him as Defendants in any of his prior lawsuits. Keeling further contends that Defendants Kerestes and Putnam retaliated against him, despite the fact that neither Defendant played any direct role in his transfer and cell assignments in 2007 and 2008. Keeling then insists that Defendants Shannon and Kerestes retaliated against him in prison transfer decisions, notwithstanding the fact that both Defendants have at various times actually supported Keeling's transfer requests. In addition, Keeling contends the Defendant Piazza denied him a transfer in retaliation for his past litigation activity, ignoring Piazza's uncontradicted statement that he was unaware of this activity, and that he based his decision on independent penological grounds. Finally, Keeling insists that the decision at SCI-Dallas to deny him Z-code status was some form of retaliation for litigation which he had already lost years earlier, discounting the fact that he actually enjoyed Z-code status at that prison for a full year before a corrections-wide policy change required a reconsideration of all such inmate housing.

In sum, given the enormous gulf in time which separates the events that Keeling attempts to link together; recognizing that the uncontradicted evidence further undermines any claim of retaliation in a host of ways; and acknowledging that this Court has flatly rejected far more specific and compelling inmate retaliation

claims as too remote in time, See, DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir.

2010)(denying inmate Z-code cell transfer retaliation claim, two months temporal

proximity insufficient), Keeling's retaliation claims fail as a matter of law and should

be dismissed.

### D. The Defendants Are Entitled to Qualified Immunity

Finally, even if Keeling had stated a colorable claim for any actions relating to

these transfer and cell assignment decisions, the Defendants are nevertheless entitled

to qualified immunity from these claims for damages. In order to establish a civil

rights claim Keeling must show the deprivation of a right secured by the United

States Constitution or the laws of the United States. Satisfying these elements alone,

however, does not guarantee that Keeling is entitled to recover damages from these

public officials. Government officials performing "discretionary functions," are

insulated from suit if their conduct did not violate a "clearly established statutory or

constitutional right[] of which a reasonable person would have known." Wilson v.

Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, —U.S.—, 129 S. Ct.

808, 815 (2009). This doctrine, known as qualified immunity, provides officials

performing discretionary functions not only defense to liability, but also "immunity

from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009)

(Conner, J.) (citations omitted). Qualified immunity

balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 129 S. Ct. at 815

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 129 S. Ct. 808; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 129 S. Ct. at 815-16; Saucier, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 129 S. Ct. at 820, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of

[the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

In this case, where Keeling's constitutionally protected litigation activity preceded the contested transfer and cell assignment decisions by five years or more, reasonable corrections officials could not have recognized that these remote and disparate events would support a retaliation claim. Indeed, far less remote and more proximate events have been held legally insufficient to support such a claim of retaliation. See, e.g., DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010)(denying inmate Z-code cell transfer retaliation claim, two months temporal proximity insufficient); Bailey v. Commercial National Insurance Co., 267 F.App'x., 167 (3d Cir. 2008)(employment discrimination-retaliation case, four months temporal proximity insufficient); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir.1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir.1992) (4-month period insufficient). Given the state of the law in this

field, in this setting the Defendants simply could not have recognized that their actions on Keeling's housing and transfer requests would violate "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Therefore, the Defendants are entitled to qualified immunity on this claim.[3]

## IV. **Recommendation**

Accordingly, for the foregoing reasons, IT IS RECOMMENDED, that the Defendants motion for summary judgment (Doc. 93) be GRANTED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or

---

[3]While the Defendants have not separately argued qualified immunity in this motion, they have raised this defense in their answer to Keeling's complaint, (Doc. 62) and this Court is entitled to address this defense *sua sponte*, when appropriate. See Doe v. Delie, 257 F.3d 309 (3d Cir. 2001) (affirming *sua sponte* recommendation of qualified immunity by U.S. magistrate judge).

recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 1st day of March, 2011.

<u>*S/Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge